**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| RICHARD DYER,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 5:25-CV-02529-JRA<br><br>JUDGE JOHN R. ADAMS<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Richard Dyer challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a report and recommendation. (*See* non-document entry of Nov. 20, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Dyer applied for DIB in December 2023 and for SSI in February 2024; both applications allege he became disabled on December 31, 2020 due to epilepsy, traumatic brain injury (TBI), gunshot wound in the left leg with paralysis, lumbar degenerative disc disease, attention deficit hyperactivity disorder (ADHD), and depression. (*See* Tr. 378). After his claims were denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge. (Tr. 367, 376-77, 433). On February 4, 2025, Mr. Dyer (represented by counsel) and a

vocational expert (VE) testified before the ALJ. (Tr. 43-77). On February 12, 2025, the ALJ determined Mr. Dyer was not disabled. (Tr. 17-34). On September 24, 2025, the Appeals Council denied Mr. Dyer's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Mr. Dyer timely filed this action. (ECF #1).

## Factual Background[1]

### I. Personal and Vocational Evidence

Mr. Dyer was 39 years old on the alleged onset date and 43 years old at the hearing. (*See* Tr. 368). He has a bachelor's degree and, according to his testimony, last worked in 2018 as a truck driver. (Tr. 52, 63). In statements to his providers Mr. Dyer endorsed working in May 2021 and September and October 2022. (Tr. 649, 699, 702).

### II. Relevant Medical Evidence

On March 9, 2020, Mr. Dyer sought orthopedic treatment for left low-back pain that began two weeks before. (Tr. 1041). He reported numbness with associated tingling and aching as well as dull, sharp, and throbbing pain radiating to the left hip, buttock, and leg. (*Id.*). The pain was worse with sitting, coughing, sneezing, and using the bathroom though better with movement. (*Id.*). Mr. Dyer also described pain radiating up his spine and into his head that worsened with flexion. (*Id.*). The orthopedic provider documented a normal gait and station, intact motor strength in the spine and lower extremities, full range of motion, intact sensation, normal coordination, and mild

[1] Mr. Dyer challenges the ALJ's conclusion he can stand and walk for long enough to meet the requirements of light work and contends the ALJ erred in rejecting his allegations of disabling pain. (ECF #10 at PageID 3184, 3186). As a result, I limit my review of the record to the evidence relevant to his arguments.

tenderness to deep palpation of the left paraspinal muscles in the lumbar region. (Tr. 1042). Mr. Dyer received a three-day steroid Dosepak and diclofenac (a muscle relaxer). (Tr. 1043). He returned to the orthopedic provider three days later with the same complaints plus numbness over his head and left shoulder. (Tr. 1038). The orthopedic provider reported a normal physical examination and referred Mr. Dyer to a neurologist to rule out intra-cranial involvement from a 2009 TBI. (Tr. 1039-40).

In April, Mr. Dyer consulted with neurologist Ryan Drake, D.O., regarding lumbar pain with radiation and numbness. (Tr. 671). Mr. Dyer reported his history of a TBI and post-TBI symptoms, including difficulty squatting and seizures. (*Id.*). He reported his pain and other symptoms flare up "from time to time," including uncontrolled hand-flexing, right-sided shaking, and trouble thinking; more recently he has frequent headaches with associated sensitivity to light and sound. (*Id.*). He also reported his history of febrile seizures. (Tr. 672). The physical examination was unremarkable and showed normal strength, concentration, memory, reflexes, sensation, coordination, gait, and station. (Tr. 673). Dr. Drake prescribed Depakote for seizure and migraine prevention, Maxalt for migraine relief, and methylphenidate (a drug to help him think clearly) for attention and cognition. (Tr. 674; *see also* Tr. 672). Dr. Drake also ordered an EEG and a brain MRI. (Tr. 674). Both tests were normal. (Tr. 666).

In May, Mr. Dyer presented at a telehealth session with Dr. Drake's physician assistant Casey Gayer, PA-C. (Tr. 665). There, Mr. Dyer reported feeling "about the same," including feeling dizzy and shaking when he squats but denied further episodes of right-sided shaking. (*Id.*). He clarified that his "trouble with thinking" included being forgetful, not completing tasks, stuttering and word-finding difficulties. (*Id.*). His headaches were not as severe but still present.

(Tr. 666). PA Gayer increased Depakote, continued Mr. Dyer's other medications, and ordered neuropsychological testing to investigate his memory impairment as Mr. Dyer did not undergo any cognitive testing after the TBI. (Tr. 666, 668-69).

Mr. Dyer attended a follow-up telehealth session with PA Gayer in July and reported that Depakote helped control his headaches, but he continued to have left-sided pain and issues with his memory. (Tr. 661-62). He was headache-free at present, had four headaches in the last month that were relieved with Maxalt, and could not recall when he last had a seizure. (Tr. 662). He endorsed working at that time. (*Id.*). PA Gayer continued Mr. Dyer's prescriptions and discussed the importance of staying "very active," getting daily exercise, staying well-hydrated, and getting enough sleep. (Tr. 663).

In September, Robert Humphries, Ph.D., issued a report with the results of Mr. Dyer's neuropsychological testing. (Tr. 678-82). Mr. Dyer demonstrated average to above average cognitive functioning, with superior skills on the nonverbal Blocks pattern subtest, average capacities in verbal reasoning, abstraction, and working memory, and slow processing speed. (Tr. 682). He demonstrated "some level of distraction" but there was "no discernible" ADHD. (*Id.*). Dr. Humphries found "strong reason to suspect that his slower processing speed, his seizure medication, and his sleep issues may be causing some of this daytime forgetfulness." (*Id.*).

In February 2021, Mr. Dyer had some breakthrough "black out spells" with confusion after the episodes. (Tr. 653). During his telehealth session with Dr. Drake that month, he admitted noncompliance with Depakote, and after he said it made him feel loopy and he cannot work on cars when he takes the medication as prescribed, Dr. Drake suggested he take the extended-release form of the medication and only at night. (*Id.*). Mr. Dyer also reported he has not been sleeping

well due to stress, and his headaches fluctuate but Maxalt relieves the pain. (*Id.*). Dr. Drake prescribed extended-release Depakote and continued Mr. Dyer's other medications. (Tr. 653-54).

In May, Mr. Dyer reported tolerating the extended-release Depakote and had not had any seizures since February, though he felt like he was going to have one. (Tr. 648-49). He also described increased headaches due to stress and reported that methylphenidate no longer worked. (Tr. 649). At the time, Mr. Dyer was working for up to 20 hours a day in his own mechanic shop. (*Id.*). Dr. Drake increased methylphenidate, continued Mr. Dyer's other medications, and discussed the importance of sleep hygiene to address increased headaches and avoid breakthrough seizures. (Tr. 649-50).

In July 2022, Mr. Dyer sought treatment with primary care physician Alaa Mahdi Al Saif, M.D. (Tr. 955). There, he reported a history of seizures, a possible seizure one month ago, and mild-to-moderate chronic low-back pain. (*Id.*). He was no longer taking methylphenidate. (*Id.*). Dr. Al Saif documented a normal physical examination. (Tr. 956). He prescribed methylphenidate and sent Mr. Dyer for a consultation to investigate seizures. (Tr. 957). That same month, Mr. Dyer endorsed working on home renovations. (Tr. 792). Mr. Dyer followed up with Dr. Al Saif in October and reported methylphenidate helped his concentration, but he was not taking Depakote regularly, and his mild-to-moderate low-back pain was manageable and did not cause radiating pain. (Tr. 926). In November 2022, Mr. Dyer reported being "busy as always" and doing renovations on his home and getting back into racing. (Tr. 705).

In May 2023, Mr. Dyer was taken to the emergency room after police shot him in the left arm and leg with bean bag rounds and tased him. (Tr. 765). The provider noted tissue swelling to the left forearm and a beanbag protruding from a wound at his left mid-calf, but the examination

was otherwise normal and Mr. Dyer could walk. (Tr. 765-66). The object was removed and the laceration sutured. (Tr. 767). He was discharged to police custody. (Tr. 777). Still in police custody, Mr. Dyer returned on May 8 and reported numbness, tingling, and swelling in the left leg. (Tr. 786). The sutures were removed, lower-leg and foot swelling were documented, and Mr. Dyer was a referred to an orthopedic surgeon. (Tr. 787-88). He met with the orthopedic surgeon the next week and reported sharp and stabbing pain in the left leg. (Tr. 1035). Visual inspection of the calf wound showed mild erythema with a hematoma while physical examination of his left knee, ankle, and toes was normal. (Tr. 1036). Mr. Dyer reported stopping all medications, so the orthopedic surgeon prescribed an antibiotic.

In October, Mr. Dyer hit his head after having a seizure. (Tr. 1065). Still in police custody, he was taken to the hospital to investigate his headache and vision changes. (*Id.*). The provider documented a steady gait, unremarkable physical examination, and a negative CT scan. (Tr. 1066). His headache improved with Fioricet and he was discharged into police custody. (*Id.*).

Mr. Dyer was released after 6 months in jail. (*See* Tr. 855). On November 22, 2023, Mr. Dyer met with Dr. Al Saif and reported pain, numbness, and burning in the left leg and knee and difficulty walking even short distances. (Tr. 855). He also requested the doctor to restart his prescription for methylphenidate. (*Id.*). Dr. Al Saif noted an abnormal gait and left leg sensory deficits. (Tr. 858). He referred Mr. Dyer to an orthopedist to evaluate his leg pain and prescribed methylphenidate for inattention and pregabalin for mononeuropathy in the left leg. (*Id.*).

In December, Mr. Dyer met with Grace Goske, APRN, CNP, to evaluate his leg pain. (Tr. 1085). He described pain and numbness over the wound that radiates up and down the outside of his lower leg and into his foot and is aggravated by walking and bearing weight on the leg, for

which he uses a cane. (*Id.*). Examination of the left leg revealed abnormal range of motion and decreased muscle strength in the ankle, along with decreased sensation along the lateral calf and an abnormal gait. (Tr. 1087-89). Plain x-rays were normal and CNP Goske suspected neuropathy and nerve damage due to the "significant weakness with any [range of motion] of his ankle and foot." (Tr. 1089). She ordered an MRI and EMG, recommended Mr. Dyer start physical therapy, and encouraged him to continue using his cane to walk. (*Id.*).

At the end of the month, Mr. Dyer met with CNP Goske and reported chronic low-back pain radiating into his left leg and new pain in his shoulders. (Tr. 1417). CNP Goske noted an antalgic gait and weakness in the left lower leg. (Tr. 1420). A lumbar X-ray showed mild degenerative changes at the L5-S1 level. (*Id.*). CNP Goske prescribed Mobic (an anti-inflammatory) and referred him for physical therapy. (Tr. 1421). At the time, Mr. Dyer reported being "very active in work that requires a lot of bending and lifting." (*Id.*).

On December 20, 2023, Mr. Dyer began physical therapy for left leg pain. (Tr. 1079-80). He arrived using a cane and reported the pain interferes with walking, using the stairs, squatting, sleeping, physical and recreational activities, running, and jumping. (Tr. 1080). The physical therapist documented impaired sensation and diminished range of motion in the left leg, ankle, and foot, and significantly diminished strength in the left ankle and toes. (Tr. 1081-82). Mr. Dyer did not bring his cane to his next physical therapy session and in its absence, he walked with a significantly antalgic gait. (Tr. 1077).

On January 10, 2024, Mr. Dyer met with pain management physician Nicholas Volchko, M.D., for pain in his left leg, arm, and shoulder. (Tr. 1510). He reported a lifelong history of back pain, and left leg pain after being shot. (*Id.*). The leg pain, described as sharp, aching, and stabbing,

is present while sitting and increases with any kind of weightbearing activity. (*Id.*). He has numbness and tingling below the mid-calf, cannot flex or extend his foot, and must walk with a cane. (*Id.*). Dr. Volchko documented tenderness to palpation at the L4-L5 and L5-S1 levels, left worse than right, positive facet loading, tenderness to palpation over the left sacroiliac joint, and a positive right-sided straight-leg-raise test. (Tr. 1513). He recommended increasing Lyrica and continuing physical therapy and prescribed a methylprednisolone Dosepak for back pain. (Tr. 1514). Mr. Dyer returned to Dr. Volchko's office in February with continued leg pain. (Tr. 1484). He admitted not wanting to try Lyrica but continued to take meloxicam. (*Id.*). Dr. Volchko noted low back tenderness and a positive straight-leg-raise test on the left. (Tr. 1486). He prescribed amitriptyline and referred Mr. Dyer to physical therapy. (Tr. 1487).

In April, Mr. Dyer reported great success with using a TENS unit during physical therapy but overall, the therapy, amitriptyline, and NSAIDs did not improve his pain. (Tr. 1703). Dr. Volchko noted an abnormal signal from the left anterior tibialis muscle "without definitive pathology" on the EMG and a positive straight-leg-raise test on examination, but no signs or symptoms of complex regional pain syndrome to explain his reported 10/10 pain. (Tr. 1703, 1705). He ordered a lumbar MRI and a TENS unit for Mr. Dyer's use at home and directed him to continue meloxicam. (Tr. 1705).

During physical therapy on April 26, 2024, Mr. Dyer reported significant leg pain and worsening back pain, muscle relaxers ineffective, pain medication helped but pain returned after he ran out, pain is "bearable" when he is moving but "excruciating" when he stops moving, and pain returns worse after he finds something that brings relief. (Tr. 1593). The therapist noted tenderness to palpation of the spinal musculature, normal spinal range of motion with reported

increased pain, normal range of motion and strength in the left leg except for the left ankle, and an antalgic gait with decreased cadence and step length and increased lateral sway. (Tr. 1594-95). The therapist used dry needling at trigger points in the left leg to address radicular symptoms and at homeostatic points along the lumbar vertebral musculature for back pain. (Tr. 1595-96).

In May, a lumbar MRI showed a "[l]eft lateral disc extrusion at L5-S1 narrowing the subarticular recess and contacting the traversing left S1 nerve root and contributing to left L5-S1 foramen." (Tr. 1721). Dr. Volchko noted midline and muscle tenderness in the lumbar area and a positive left straight-leg-raise test. (Tr. 1693). He recommended transforaminal epidural steroid injections (TFESI) at L5 and S1. (Tr. 1694). Two weeks after the injections, Mr. Dyer reported 75% reduction in pain and described walking longer distances, being more comfortable in a standing position, and using meloxicam as needed. (Tr. 1680). Dr. Volchko's PA recommended repeating the procedure every three to four months as needed. (*Id.*).

On June 6, Mr. Dyer met with Dr. Al Saif for a follow-up appointment and reported good concentration with methylphenidate, denied headaches, and described some improvement in left leg weakness with the injections. (Tr. 1681). In July, Mr. Dyer reported working on his house and his garage. (Tr. 1847). In August he was "doing more around the house." (Tr. 1949).

By mid-September, Mr. Dyer's low-back pain returned, and he reported struggling with his daily activities due to the pain. (Tr. 2002). Dr. Volchko's PA recommended repeating the TFESI injections and prescribed a short course of pain medication. (Tr. 2005). Physical therapy notes from that month show Mr. Dyer demonstrated fair progress in his plan of care. He reported that dry needling manages his pain and the therapist documented improvement in left leg strength with minimal limitation in lumbar range of motion. (Tr. 1996). Later in the month, he came into

the clinic with an antalgic gait pattern and, after dry needling treatment, reported decreased pain and left the clinic with a "significantly less antalgic pattern." (Tr. 1994). At the end of the month, Mr. Dyer reported general shoulder soreness that intensified while painting his garage. (Tr. 1990). He returned for his 19th physical therapy session with new orders to address bilateral shoulder pain, especially with reaching overhead and carrying. (Tr. 1984; *see* Tr. 1989-91). He was not using a cane at the time, though his gait was described as abnormal. (Tr. 1984).

In October, Mr. Dyer received the second set of lumbar TFESI injections. (Tr. 1982-83). Two weeks later, Mr. Dyer met with Dr. Drake and reported episodes of vision changes and shaking when he stands up or squats and stands up, lasting about 30 to 45 seconds. (Tr. 2044). Dr. Drake determined his symptoms were more consistent with orthostatic hypotension and referred him to a cardiologist for evaluation. (*Id.*).

That month, Mr. Dyer also met with a registered dietician for medical nutrition therapy to discuss the best foods to address his blood pressure and cholesterol. (Tr. 2077). During the appointment, Mr. Dyer reported being active all day until dinner. (*Id.*).

In mid-November, Mr. Dyer reported to Dr. Volchko's PA that the injections did not help, and his back and leg pain were worse than ever despite taking methocarbamol and Mobic. (Tr. 2717). She provided a short course of pain medication and offered Lyrica or gabapentin for long-term pain control. (*Id.*). Mr. Dyer declined the long-term medications because they "make [him] crazy." (*Id.*). That month, he obtained another order for a handicapped placard from Dr. Al Saif. (Tr. 2913). On November 25, his physical therapist noted he did not use a cane and his gait was mildly antalgic. (Tr. 2124, 2127). That day, Mr. Dyer reported continued pain and that he cannot

"just sit still at home" or he gets stiff and tenses up. (Tr. 2124). At his next session on December 6, Mr. Dyer reported feeling soreness in his shoulders after working on his snowmobile. (Tr. 2102).

In December, Mr. Dyer met with Dr. Volchko's PA and reported working full time but struggling due to continued low-back and left leg pain that are temporarily relieved with dry needling and meloxicam. (Tr. 3036). His pain medication was unhelpful. (*Id.*). He received a prescription for Percocet and a referral to a neurosurgeon for evaluation. (Tr. 3040). He reported some shoulder soreness after working on his snowmobile. (Tr. 2102). Mr. Dyer met with neurosurgeon Dhiego Chaves de Almeida Bastos, M.D., and reported his low-back pain is worse in the morning and shoots down the outside of his left thigh. (Tr. 3003). He endorsed some relief with physical therapy and NSAIDs but described severe pain. (*Id.*). Dr. Bastos noted good memory, attention, and concentration; no decreased sensation in the limbs; intact motor strength; steady gait; negative straight-leg-raise testing, and paraspinal lumbar tenderness. (Tr. 3005-06). Because Mr. Dyer had failed conservative treatmen,t Dr. Bastos suggested a microdiscectomy at the L5-S1 level. (Tr. 3007).

**III. Medical Opinions**

In January 2024, Mr. Dyer spoke with a Social Security representative and reported issues with standing and walking, estimating he can stand 10 seconds and cannot walk without assistance. (Tr. 605). He also reported having pain and swelling in his legs when he sits longer than 30 minutes. (*Id.*).

In February 2024, during initial review of Mr. Dyer's claims, state agency medical consultant Bradley Lewis, M.D., considered the available medical records and statements Mr. Dyer made about his symptoms and determined he can lift and carry 50 pounds occasionally and 25

pounds frequently; walk/stand and sit for about 6 hours each in an 8-hour workday; frequently push and pull with the left leg; frequently climb ramps and stairs but never ladders, ropes, or scaffolds; frequently crouch; and must avoid all exposure to hazards. (Tr. 373).

In April 2024, on reconsideration of Mr. Dyer's claims, state agency medical consultant Leon Hughes, M.D., considered updated medical records and determined he is limited in pushing and pulling with the left leg but he can lift and carry 20 pounds occasionally and 10 pounds frequently; walk/stand and sit for about 6 hours each in an 8-hour workday; frequently climb ramps and stairs but never ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; and must avoid all exposure to hazards. (Tr. 384-85).

## IV. Testimonial Evidence

Mr. Dyer testified he stopped working as a truck driver in 2018 because his back pain became intolerable and he was fired from his position after missing work due to a combination of migraines, mental health issues, and back pain. (Tr. 53, 64). He can sit for five to six minutes before needing to stretch, stand for ten minutes while putting most of his weight on the right leg, cannot walk long distances, and typically uses a cane. (*Id.*). He has seizures "a couple times a month," memory loss, and headaches that can last all day. (Tr. 57-58). Mr. Dyer uses pain medication, muscle relaxers, a TENS unit, and heat for back pain and over-the-counter medications for headaches but does not take medications for seizures. (Tr. 55-56, 66).

On a typical day, Mr. Dyer claims to do very little. It takes him about an hour to get moving in the morning. (Tr. 62). He does some stretches, gets dressed, goes downstairs, eats breakfast, and watches television. (*Id.*). When his fiancée's son returns from school, he helps Mr. Dyer do anything that needs done and "might play a video game with him." (*Id.*). His fiancée

works evening hours, so he waits up until she gets home and then goes upstairs to watch television before bed. (*Id.*). Mr. Dyer drives for short distances and uses a handicapped placard. (Tr. 52-53). He was scheduled for back surgery the day after the hearing. (Tr. 48).

The VE testified that a person of Mr. Dyer's age and education who is subject to the limitations ultimately assessed in the ALJ's RFC can perform light work as a marker, routing clerk, and cleaner–housekeeping. (Tr. 68-70).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

## The ALJ's Decision

At Step One, the ALJ determined Mr. Dyer had not worked since December 31, 2020, the alleged onset date. (Tr. 19). At Step Two, the ALJ identified the following severe impairments: lumbar degenerative disc disease with radiculopathy; sacroiliitis; compression neuropathy of the left lower extremity status post gunshot wound and compound fracture to left lower extremity; seizure disorder and epilepsy; TBI; depressive disorder and adjustment disorder; anxiety; unspecified personality disorder with anti-social traits; ADHD; and post-traumatic stress disorder. (*Id.*). At Step Three, the ALJ found Mr. Dyer's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 20-23). At Step Four, the ALJ determined Mr. Dyer's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except: He can frequently push, pull and operate foot controls with the left lower extremity. He can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, and occasionally stoop, kneel, crouch, and crawl. The claimant can frequently reach the left upper extremity. He can tolerate no more than moderate noise intensity work settings, with occasional exposure to bright lights (brighter than a typical office setting). He must avoid all exposure to hazards such as unprotected heights, dangerous moving mechanical parts and commercial driving.

(Tr. 23). Because Mr. Dyer had no past relevant work, the ALJ proceeded to Step Five. (Tr. 32). At Step Five, the ALJ found Mr. Dyer could perform other work, including as a marker, routing clerk, and cleaner–housekeeping. (Tr. 33). Thus, the ALJ concluded Mr. Dyer was not disabled. (Tr. 34).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by

the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Mr. Dyer challenges the RFC, particularly the ALJ's conclusion that he can stand and walk long enough to meet the requirements of light work.[2] (ECF #10 at PageID 3184). He argues the ALJ did not apply the correct legal standards when evaluating his symptoms and "[h]ad the ALJ

---

[2] Under the regulations, light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). Even if the weight lifted is very little, a job is still in the light work category when it requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

properly considered the relevant factors," the ALJ would not have found him capable of performing light work. (*Id.*). More specifically, Mr. Dyer claims the ALJ did not consider all relevant evidence in evaluating his need for a cane, improperly characterized his treatment as conservative, and did not address objective findings supporting his allegations. (*Id.* at PageID 3184-86). The Commissioner counters that the ALJ properly considered the factors relevant to evaluating a claimant's symptoms and substantial evidence supports his conclusions. (ECF #11 at PageID 3197-3202).

**I. The ALJ properly evaluated Mr. Dyer's reported symptoms and their impact on his activities.**

When an individual has one or more impairments that are severe but do not meet or medically equal a listed impairment, the ALJ must identify the individual's functional limitations and assess his remaining capacities for work-related activities, known as the residual functional capacity or RFC. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also* Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2 (July 2, 1996). The RFC is an assessment of the most an individual can still do despite his limitations, or more specifically, the extent to which an individual's impairments and related symptoms, including pain, may cause physical or mental limitations or restrictions that affect his capacity to do work-related physical or mental activities. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *2. It is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2. The assessment is based on all relevant evidence. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also* SSR 96-8p, 1996 WL 374184, at *2, *5. When assessing an individual's RFC, the ALJ must "include a narrative discussion describing how the

evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations).” SSR 96-8p, 1996 WL 374184, at *7. The ALJ must also “explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.” *Id.*

The ALJ uses a two-step process to evaluate a claimant’s reports about symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). First, the ALJ considers whether there is an underlying impairment that could reasonably be expected to produce the individual’s symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 16-3p, 2017 WL 5180304, at *3. If that is established, then the ALJ evaluates the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the individual’s ability to perform work-related activities. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 16-3p, 2017 WL 5180304, at *3. To evaluate intensity and persistence, the ALJ considers whether the individual’s statements about their symptoms and functional effects are consistent with objective medical evidence, treatment, daily activities, and other evidence. SSR 16-3p, 2017 WL 5180304, at *5-8. The ALJ also considers the location, duration, frequency, and intensity of symptoms; factors that precipitate or aggravate the symptoms; medications and their side effects; treatment and other measures used for pain relief; and any other factor concerning limitations due to symptoms. 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3); *see also* SSR 16-3p, 2017 WL 5180304, at *7-8. The ALJ “will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the individual’s] statements and the rest of the evidence, including [] history, the signs and laboratory findings, and statements by medical sources and others about how [] symptoms affect [the individual.” 20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4). The ALJ need not accept a claimant's reported symptoms when they are inconsistent with the evidence. SSR 16-3p, 2017 WL 5180304, at *8. And the ALJ "will explain which of an individual's symptoms [he] found consistent or inconsistent with the evidence" and how that evaluation led to the ALJ's conclusions. *Id.*

I find the ALJ properly evaluated the statements Mr. Dyer made about the intensity, persistence, and limiting effects of his symptoms. The ALJ considered Mr. Dyer's testimony that he typically uses a cane to walk, cannot stand or walk long enough to meet the requirements of light work, cannot sit longer than five to six minutes, and compared that testimony with the objective medical evidence and evidence relevant to the factors specified in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), including Mr. Dyer's daily activities, his medication and treatment regimen, and other measures used for pain relief.

First, the ALJ emphasized that in 2020, 2021, 2022, and early 2023, Mr. Dyer described mild-to-moderate low-back pain "from time to time" but findings showed normal strength, sensation, coordination, gait, and station. (Tr. 25-27). In December 2023, Mr. Dyer began physical therapy after he described increased pain, and the provider observed some reduced strength and range of motion in the left ankle. (Tr. 28). The ALJ noted Mr. Dyer reported some relief with physical therapy and medication. (*Id.*). Not until May 2024 did a lumbar MRI show a disc extrusion contacting the S1 nerve root. (*Id.*). In June 2024, he had "significantly reduced pain" after he received a lumbar steroid injection, the effects of which lasted until November 2024 (*Id.*). The ALJ also noted Mr. Dyer did not consistently use a cane and, while his gait was occasionally antalgic, it was usually normal. (Tr. 29). The ALJ also considered Mr. Dyer's testimony that he stopped working in 2018 due to pain but was working "up to 20 hours a day" in his mechanic

shop in May 2021, and that using a TENS unit, dry needling, muscle relaxers, and pain medication help reduce his pain. (Tr. 24, 26). From this evidence, the ALJ reasonably determined Mr. Dyer's statements that his pain prevents him from working are not entirely consistent with the medical and other evidence. (Tr. 25).

**II. The ALJ did not err in declining to find Mr. Dyer needed a cane.**

I find no error in the ALJ's decision not omit use of a cane in Mr. Dyer's RFC. The ALJ need not incorporate use of a cane in the RFC unless the cane is medically required. *See Carreon v. Massanari*, 51 F.App'x 571, 575 (6th Cir. 2002). SSR 96-9p explains when a cane or other hand-held assistive device is medically required:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

1996 WL 374185, at *7 (July 2, 1996). Notations in the record about a claimant's continued use of an assistive device do not suffice. *Barnes v. Comm'r of Soc. Sec.*, 5:21-cv-1688, 2023 WL 2988346, *8 (N.D. Ohio Mar. 22, 2023) (collecting cases holding SSR 96-9p requires medical documentation of the need for the assistive device, not just notations relating to a claimant's continued use of the device). Although the regulations do not require the cane be prescribed to the claimant, *see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00C(6)(a), there must be evidence from a medical source describing the circumstances in which the cane is needed. *Cunningham v. Comm'r of Soc. Sec.*, No. 1:19-cv-2227, 2020 WL 5231985, at *10 (N.D. Ohio Sept. 2, 2020); *Golden v. Berryhill*, No. 1:18-cv-636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted,* 2019 WL 415250 (N.D. Ohio Feb. 1, 2019).

Here, after reviewing the evidence, the ALJ determined Mr. Dyer's use of a cane was not warranted as a restriction in the RFC because the evidence did not establish use of a cane is medically necessary, noting the record showed Mr. Dyer's gait was occasionally antalgic but usually normal and he did not always use the cane. (Tr. 29). Substantial evidence supports the ALJ's conclusion. The record also contains no evidence from a medical source describing the circumstances in which the cane is needed, without which Mr. Dyer cannot show medical necessity.

**III. Substantial evidence supports the ALJ's finding of conservative treatment.**

Next, Mr. Dyer contends his treatment with several medications, participation in 33 physical therapy sessions, and two epidural steroid injections should not be considered conservative when his back pain ultimately led to lumbar surgery. (ECF #10 at PageID 3185).

Conservative treatment with medication and physical therapy is a proper basis to discount a claimant's allegedly disabling pain. *See Kepke v. Comm'r of Soc. Sec.*, 636 F.App'x 625, 638 (6th Cir. 2016) (noting that the plaintiff's "routine and/or conservative treatment for the allegedly disabling impairments" was a proper basis to discount his allegations of pain). But, as Mr. Dyer suggests, an ALJ's conclusion that conservative treatment is inconsistent with a claimant's pain may not be reasonable when treatment is initially conservative but conservative measures fail over time and extensive treatment becomes necessary. *See Pickup v. Colvin,* 606 F.App'x 430, 433 (10th Cir. 2015) (holding substantial evidence did not support ALJ's conclusion that treatment was "essentially routine and/or conservative in nature" when treatment was initially conservative but those measures failed over time and extensive treatment became necessary); *see also Smith v. Saul,* No. 3:19-cv-332, 2021 WL 58198, at *4 (S.D. Ohio Jan. 7, 2021) ("Using the failure of

conservative treatment as a reason to discount a claimant's statements about pain fails the basic test of rationality.").

Here, the ALJ noted Mr. Dyer complained of mild-to-moderate low-back pain until December 2023 when he "reported about 5 flares of low back pain per year, with left leg radicular symptoms." (Tr. 25-28). Only then did Mr. Dyer begin physical therapy. At the time, lumbar spine imaging was unremarkable, showing mild degenerative change without fracture or subluxation. (Tr. 1420). Later imaging in May 2024 revealed a disc extrusion contacting the S1 nerve root, consistent with his reports of worsening pain, and epidural steroid injections provided relief until November 2024. (Tr. 28). Notably, after the injections Mr. Dyer completed some renovations on his house and garage and was doing more around the house. (Tr. 1847, 1949, 1990). Mr. Dyer was not sent to a surgeon for evaluation until the benefit from the injections wore off in late 2024.

This evidence establishes that Mr. Dyer had back pain during all of the relevant period, but it was controlled with the treatment he had until December 2024 as he reported engaging in activities like working on cars and doing home renovation work until October or November 2024, just a few months shy of the hearing before the ALJ. It was therefore reasonable for the ALJ to conclude that Mr. Dyer's conservative treatment was inconsistent with his allegations of disabling pain, and substantial evidence supports that conclusion.

**IV. The ALJ did not ignore relevant evidence of Mr. Dyer's low-back pain.**

Finally, Mr. Dyer argues his allegations of disabling pain are supported by objective findings the ALJ did not address, including EMG testing, the May 2024 MRI findings, physical examinations showing left leg weakness and positive straight-leg-raise tests, lumbar tenderness, and early evaluations showing gait abnormality. (ECF #10 at PageID 1385-86).

The applicable regulations provide that "[i]n evaluating the intensity and persistence of [a claimant's] symptoms, including pain, [the ALJ] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [] symptoms affect [the claimant]." 20 C.F.R. §§ 404.1529(a), 416.929(a). The ALJ need not discuss every piece of evidence in the record, *see, e.g.*, *Thacker v. Comm'r of Soc. Sec.*, 99 F.App'x 661, 665 (6th Cir. 2004), but it is "generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'" *Smith v. Comm'r of Soc. Sec.*, No. 1:11-cv-2313, 2013 WL 943874 (N.D. Ohio Mar. 11, 2013) (citation omitted). And district courts within the Sixth Circuit "have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability." *Mobley v. Saul,* No. 1:19-cv-2777, 2020 WL 4273560, at *11 (N.D. Ohio July 24, 2020) (citing *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) and *Germany Johnson v. Comm'r of Soc. Sec.*, 313 F.App'x 771, 777 (6th Cir. 2008)); *see also Osborne v. Comm'r of Soc. Sec.*, No. 1:19-cv-1708, 2020 WL 1677578, at *17 (N.D. Ohio Apr. 6, 2020).

Here, Mr. Dyer has not shown the ALJ selectively parsed the record for evidence placing him in a capable light or that he did not acknowledge evidence supporting disability. Indeed, the ALJ discussed all this evidence (Tr. 28) and determined the findings support limiting Mr. Dyer's use of the left leg for pushing, pulling, and operating foot controls and limiting his postural tasks (Tr. 30). Mr. Dyer's real issue with the ALJ's evaluation appears to be his disagreement with how the ALJ weighed the evidence: the ALJ determined the evidence of Mr. Dyer's low-back pain justified some restrictions in the RFC but did not render him disabled, but Mr. Dyer contends

that evidence supports his allegations of disabling pain. The problem with Mr. Dyer's argument is that even if substantial evidence supports his position, a court may not overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Because substantial evidence supports the ALJ's conclusion I decline to recommend remand on this basis.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: October 13, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the**

arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).